IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cr-20025-MSN-tmp |
| | ) | |
| CHARLES A. JONES and | ) | |
| MARK J. WHITAKER, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Before the court by order of reference is defendant Charles
Jones's Motions to Dismiss the Indictment, filed on March 15,
2019. (ECF Nos. 30; 37.)  The government responded on April 15,
2019 (ECF No. 35), and Jones replied on April 29, 2019 (ECF No.
39).  At Jones's request, the court held a hearing on June 26,
2019.  After the hearing, on June 27, 2019, co-defendant Mark
Whitaker filed a motion to join in Jones's Motion to Dismiss,
which the court granted. (ECF Nos. 58; 62.)  For the following
reasons, it is recommended that defendants' motion be denied.

## I.   PROPOSED FINDINGS OF FACT

According to the indictment, defendant Charles Jones was
the part owner of two internet technology companies, Technology
Associates and Integrated Computer Solutions.  (Indictment, ECF
No. 2 at 5 ¶ 17.)  Co-defendant Mark Whitaker was an employee of
Jones's companies.  (Id. at 5-6 ¶ 18.)  Jones's companies

provided internet services to schools within the Crockett County School District, East Prairie R-2 School District, Delta R-5 School District, and Charleston R-1 School District (collectively the "Schools"). (Id. at 6 ¶ 19, 22.) The latter three schools, which are all located in Missouri, received internet services from a Missouri State consortium called MORENet. (Id. at 6 ¶ 19.)

Jones and his companies received compensation from the E-Rate Program for providing internet services to the Schools. (Id. at 6 ¶ 22.) The E-Rate Program (the "Program") is a program of the Federal Communications Commission ("FCC"). (Id. at 1-2 ¶ 2.) The purpose of the Program "is to distribute funds to schools and libraries, so those institutions can afford needed internet access, telecommunication services and related equipment." (Id. at 2 ¶ 2.) Universal Service Administrative Company ("USAC"), a non-profit corporation, administers the Program for the FCC. (Id. at 2 ¶ 3.) The FCC has issued specific rules and regulations that govern participation in the E-Rate Program. (Id.) To obtain funds from the Program, a school must initially certify that it is purchasing equipment and internet services from a vendor. (Id. at 2 ¶ 4.) The Program may pay for up to 90% of the school's equipment and internet services costs. (Id.) Schools with the highest level of demonstrated poverty receive the most funding. (Id.)

However, under the Program, the school must pay for a portion of the internet services that the Program's funding does not cover, which is referred to as the "co-pay." (Id. at 2 ¶ 5.) "[E]ven the neediest schools are required to fund at least ten percent of the cost of the acquired services and equipment." (Id.) The co-pay requirement ensures the participating schools 1) "have a financial incentive to negotiate for the most favorable prices"; and 2) "purchase only those items and services that they truly need." (Id.)

To receive funds from the Program, a school must initially submit FCC Form 470, the Description of Services Requested and Certification Form, to USAC. (Id. at 3 ¶ 7.) FCC Form 470 is uploaded to USAC's website, which opens a competitive bidding process for the eligible services. (Id. at 3 ¶ 8.) Subsequently, the school selects a winning bid for the desired services and enters into a contract with the winning bidder. (Id. at 4 ¶ 10.) The schools then submit FCC Form 471, the Services Ordered and Certification Form, to USAC. (Id.) On this form, the school identifies the services it ordered and requests funding from the Program. (Id.) The form also contains the dollar amount that the school must pay, i.e., the co-pay, and the school certifies that "the service provider has not waived or offered to waive the school's co-pay." (Id.) Once services are installed, the school must file FCC Form 486,

Receipt of Service Confirmation Form, which certifies that services have begun. (Id. at 4 ¶ 11.) In addition, a service provider must file FCC Form 473, the Service Provider Annual Certification Form. (Id. at 4 ¶ 12.) On this form, the service provider certifies that it has complied with the Program's rules and regulations and that any failure to comply with those rules could result in criminal or civil prosecution. (Id.)

A service provider may only invoice USAC once the provider's FCC Form 473 and 486 have been approved by USAC. (Id. at 4-5 ¶ 13.) The invoice, FCC Form 474 (the Service Provider Invoice Form), informs USAC that "the service provider has provided the service, invoiced the school for its co-pay amount and is seeking the balance of the cost of services directly from USAC." (Id. at 5 ¶ 14.) If USAC needs additional information after receiving the invoice, it will request that information from the school and/or the service provider. (Id. at 5 ¶ 15.) Additional information requested by USAC may include proof that the school was billed for the required co-pay. (Id.) "The E-Rate Program will not pay a service provider's invoices that are under further review unless the service provider has certified that the school has been invoiced the amount of its co-pay and provided USAC with a copy of the bill(s) sent to the school." (Id. at 5 ¶ 16.)

Jones and Whitaker are presently under indictment for one count of conspiracy to commit wire fraud, and Jones has also been indicted with three counts of wire fraud. (ECF No. 2.) The indictment describes the fraudulent scheme as follows:

> From in or about 2000 continuing through at least August 13, 2014, the defendants participated in a scheme and conspiracy to defraud the E-Rate Program.
>
> The object of the scheme and conspiracy was to obtain money from the E-Rate Program for the benefit of Jones.
>
> It was part of the scheme and conspiracy that Jones used A.J.[1] and A.J.'s position with the Schools to select and to continue to use Jones's Companies as an E-Rate Program service provider and to circumvent E-Rate Program rules and review. Jones gave A.J. money and other things of value in return for A.J.'s assistance.
>
> It was part of the scheme and conspiracy to defraud that Jones directed Whitaker and A.J. to submit fabricated documents regarding the Schools to the E-Rate Program to make it appear that all E-Rate rules and requirements had been met. Without the submission of these fabricated documents, the E-Rate Program would not have made payment to Jones's Companies.
>
> It was part of the scheme and conspiracy that Jones directed Whitaker and A.J. to submit false statements and representations to the E-Rate Program that the schools had been billed for the full amount of their required co-payments. Without these false statements and representations that the Schools had been billed for the full amount of their required co-payments, the E-Rate Program would not have made payment to Jones's Companies.

---

[1] According to the indictment, "A.J. served as Director of Technology for Crockett County Tennessee, School District. A.J. also worked as an E-Rate Program Consultant for East Prairie R-2, Delta R-5, and Charleston R-1 School District in Missouri." (ECF No. 2 at 6 ¶ 21.)

It was part of the scheme and conspiracy that after the E-Rate Program paid money to Jones's Companies, Jones removed money from the Companies' bank accounts for Jones's own benefit.

(ECF No. 2 at 6-7 ¶¶ 23-28.)  Count 1 of the indictment charges Jones and Whitaker with conspiracy to commit wire fraud from "in or about 2000 continuing through on or about August 13, 2014." (ECF No. 2 at 7-8 ¶ 30.)  During that period, the indictment alleges Jones and Whitaker knowingly conspired and agreed to defraud the Program in the manner described in the indictment. (Id. at 8 ¶ 31.)  Counts 2 through 4 charge Jones with wire fraud for submitting, via interstate wire communication, the following items to USAC: 1) FCC Form 486, "containing a false and fraudulent representation and certification," (Id. at 8-9 ¶ 33); 2) FCC Form 471, "containing multiple false and fraudulent representations and certifications," (Id. at 9-10 ¶ 35); and 3) documentation, containing "falsified invoices provided by Jones which purported to show that Jones's Companies invoiced the East Prairie R-2 School District the correct co-pay share." (Id. at 10 ¶ 37).

In Jones's motion, he argues the wire fraud counts should be dismissed because "the indictment does not allege an intent to deprive any entity of money or property." (ECF No. 30-1 at 10.)  Jones also argues those charges should be dismissed because "the party allegedly being deprived a property right is

- 6 -

not the same party purportedly being defrauded." (<u>Id.</u> at 14.) Finally, Jones argues that part of the wire fraud conspiracy charge should be dismissed because "the indictment misstates the law with regard to a school's obligation to pay in the early years of the E-Rate Program." (<u>Id.</u> at 17.) Co-defendant Whitaker joins Jones's Motion to Dismiss to the extent it seeks dismissal of Count 1. (ECF Nos. 58; 62.)

## II. PROPOSED CONCLUSIONS OF LAW

### A. Legal Standard

Under Federal Rule of Criminal Procedure 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" An indictment does not need to "contain a formal introduction or conclusion." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient if it contains the elements of the offense charged, fairly informs a defendant of the charge against which he must defend, and enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." <u>United States v. Fitzgerald</u>, 366 F. Supp. 3d 903, 905 (W.D. Mich. 2017). "An indictment will usually be sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense." <u>United States v. Huff</u>, 630 F. App'x 471, 489 (6th Cir. 2015) (quoting <u>United States v.</u>

Superior Growers Supply, Inc., 982 F.2d 173, 176 (6th Cir. 1992)). "However, the recitation of statutory language must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged." United States v. McAuliffe, 490 F.3d 526, 531 (6th Cir. 2007) (internal citation and quotation omitted). "Further, '[t]he indictment must be read as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications. An indictment is to be construed liberally in favor of its sufficiency.'" United States v. Lee, 919 F.3d 340, 349 (6th Cir. 2019) (quoting McAuliffe, 490 F.3d at 531).

"Federal Rule of Criminal Procedure 12(b)(3)(B)(v) provides that 'a defect in the indictment,' specifically the failure to state an offense, 'must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits[.]'" United States v. Hofstetter, No. 3:15-cr-27, 2018 WL 1704241, at *6 (E.D. Tenn. Jan. 3, 2018) (quoting Fed. R. Crim. P. 12(b)(3)(B)(v)). "On a motion to dismiss [an] indictment, 'the [c]ourt must view the [i]ndictment's factual allegations as true, and must determine only whether the [i]ndictment is valid on its face.'" United States v. Phillips, No. 2:14-cr-76, 2015

WL 13662851, at *3 (E.D. Tenn. Sept. 25, 2015), <u>report and</u> <u>recommendation adopted by</u>, 2016 WL 10689700 (E.D. Tenn. Jan. 26, 2016) (quoting <u>United States v. Campbell</u>, No. 02-80863, 2006 WL 897436, at *2 (E.D. Mich. April 6, 2006)).  A court "may make preliminary findings of fact necessary to decide the questions of law presented by [a] pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact."  <u>United States v. Jones</u>, 542 F.2d 661, 664 (6th Cir. 1976).  "Resolution of a pretrial motion to dismiss the indictment for failure to state an offense is appropriate when the 'facts surrounding the alleged offense [are] virtually undisputed and trial of the substantive charges would not substantially assist the court in deciding the legal issue raised by the motion to dismiss the indictment.'"  <u>Hofstetter</u>, 2018 WL 1704241, at *6 (quoting <u>Jones</u>, 542 F.2d at 665).

## B.  Wire Fraud

Counts 2, 3, and 4 of the indictment charge Jones with wire fraud in violation of 18 U.S.C. § 1343.  The wire fraud statute provides: "Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, [or] representations . . . transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purpose of

executing such scheme or artifice," shall be subject to
imprisonment. 18 U.S.C. § 1343. "The first element of wire
fraud, then, is that the defendant devised or willfully
participated in a scheme to defraud. The second is that he used
or caused to be used an interstate wire communication 'in
furtherance of the scheme'; and the third, that he intended 'to
deprive a victim of money or property.'" United States v.
Faulkenberry, 614 F.3d 573, 580 (6th Cir. 2010) (quoting United
States v. Prince, 214 F.3d 740, 748 (6th Cir. 2000)).

Jones argues the wire fraud counts should be dismissed for
two reasons. First, he argues the indictment does not allege an
intent to deprive anyone of money or property. (ECF No. 30-1 at
10.) Second, he contends the wire fraud counts are insufficient
"because the party allegedly being deprived a property right is
not the same party purportedly being defrauded." (Id. at 14.)

1.  Intent to Deprive

According to Jones, for a defendant "[t]o be convicted of
wire fraud, the government must prove an 'intent to deprive a
victim of money or property.'" (ECF No. 30-1 at 10) (quoting
United States v. Turner, 465 F.3d 667, 680 (6th Cir. 2006)).
Jones argues the wire fraud counts are insufficient because they
do not allege he intended to deprive anyone of money or
property. (Id.) In support of this argument, Jones relies
heavily on the Sixth Circuit's decision in United States v.

- 10 -

_Sadler_, 750 F.3d 585 (6th Cir. 2014).  In _Sadler_, the defendants owned and operated two pain-management clinics.  One of the defendants, Nancy Sadler, obtained various pills for her clinics by "using a fake name on her drug orders and by falsely telling the distributors that the drugs were being used to serve 'indigent' patients."  _Id._ at 590.  These purchases were facilitated by Sadler through faxes, phone calls, and other methods of interstate wire communication.  Sadler was subsequently indicted for and convicted of wire fraud.[2]

The Sixth Circuit reversed Sadler's wire fraud conviction because at trial there was insufficient evidence that she intended to deprive a victim of money or property.  _Id._ at 592. In reaching this conclusion, the court first rejected the government's argument that Sadler deprived the pill distributors of their pills (the property).  The court reasoned that although the companies' pills were gone after the transactions, "paying the going rate for a product does not square with the conventional understanding of 'deprive.'"  _Id._ at 590.  The court further stated that "[s]tealing the pills would be one thing; paying full price for them is another. Case law reinforces that the conventional meaning of 'deprive' applies in the fraud context.  To be guilty of fraud, an offender's

---

[2]She was convicted of several other crimes; however, those crimes are not relevant to the present analysis.

- 11 -

'purpose must be to injure[.]'" Id. (quoting Horman v. United States, 116 F. 350, 352 (6th Cir. 1902)). The court concluded that Sadler "may have had many unflattering motives in mind in buying the pills, but unfairly depriving the distributors of their property was not one of them." Id.

The government also argued that Sadler "deprived the [pill distributors] of what might be called a right to accurate information before selling the pills." Id. at 590-91. In other words, but for Sadler's lies the pill distributors would not have sold her the pills. The court rejected this argument and found that the wire fraud statute is "'limited in scope to the protection of *property rights*,' and the ethereal right to accurate information doesn't fit that description." Id. at 591 (quoting McNally v. United States, 483 U.S. 350, 360 (1987)). The court added that "the right to accurate information [does not] amount[] to an interest that 'has long been recognized as property.'" Id. (quoting Cleveland v. United States, 531 U.S. 12, 19 (2000)). The court further recognized that after the Supreme Court's decision in McNally, Congress reacted in a limited manner; "[i]nstead of reinstating the universe of previously protected intangible rights, it embraced just one of them: 'the intangible right of honest services,' which protects citizens from public-official corruption." Id. (quoting 18 U.S.C. § 1346). The court concluded that Sadler's

- 12 -

"fabrications, objectionable though they may be and punishable under other laws though they may be, fall outside [the wire fraud] statute." Id.

In the present case, Jones is charged with defrauding the Program by falsely representing that the Schools Jones provided internet services to were paying the Program's required co-pay. Because of these false representations, Jones's contracts with the Schools were substantially funded by USAC (under the Program). Count 2 of the indictment alleges:

> On or about February 13, 2014, in the Western District of Tennessee and elsewhere,
>
> CHARLES A. "CHUCK" JONES
>
> being aided and abetted by A.J., did, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, knowingly cause to be transmitted by means of wire and radio communication in interstate commerce, writing, signs, signals, pictures and sounds, specifically a FCC Form 486 containing a false and fraudulent representation and certification.
>
> All in violation of Title 18, United States Code, 1343.[3]

(ECF No. 2 at 8-9 ¶ 33.)  Utilizing Sadler, Jones argues the wire fraud counts are insufficient because

---

[3]Counts 3 and 4 of the indictment, which are the two other wire fraud counts, allege that Jones utilized interstate wire communication on two other occasions in furtherance of the same scheme. (ECF No. 2 at 9 ¶ 35; 10 ¶ 37.)

If one accepts the government's allegations at face
value, the defendants deprived the E-Rate Program of
accurate information in the same way that [Sadler]
deprived the drug distributors of accurate information
by submitting fabricated orders and false
certifications regarding the intended uses of the
narcotics she purchased. In both cases, the party who
was purportedly defrauded received its respective
benefit of the bargain. In Sadler, the distributors
were paid full price for their pills, and in the
instant case the Schools received the technology and
internet services they had applied for and the E-Rate
Program was designed to secure.

(ECF No. 30-1 at 12.)

The court rejects this argument for several reasons.

First, Sadler is procedurally distinguishable from the present

case because it involved a sufficiency-of-the-evidence review

post-trial, whereas Jones's motion seeks pre-trial dismissal of

the indictment. A court's review when considering whether an

indictment sufficiently states an offense is limited to

determining whether the indictment adequately contains the

elements of the offense sufficient to enable the defendant to

plead an acquittal or conviction as a bar to future prosecutions

for the same offense. In contrast, the standard applicable to

whether a conviction is supported by sufficient evidence

requires a court to go beyond the indictment and consider the

evidence that was presented at trial to determine whether any

rational trier of fact could have found the elements of the

crime beyond a reasonable doubt. Compare United States v.

Olive, 804 F.3d 747, 753 (6th Cir. 2015), with Sadler, 750 F.3d

- 14 -

at 590-91; see also United States v. Tulio, 263 F. App'x 258, 261 (3d Cir. 2008) (applying different standards of review on appeal in analyzing motion to dismiss indictment and the sufficiency of the evidence supporting conviction for mail fraud); United States v. Galecki, No. 2:15-cr-285, 2018 WL 7018192, at *13 (D. Nev. June 15, 2018) ("Galecki's reliance on Sadler is misplaced. There, the Sixth Circuit addressed the sufficiency of evidence presented at trial to uphold the defendant's fraud convictions, not the sufficiency of the charging documents or language necessary in fraud indictments.").

Second, the Sadler decision appears to be in tension with prior published Sixth Circuit case law. In McAuliffe, 490 F.3d at 531, a 2006 decision involving the mail fraud statute, the court stated that "[t]he requisite intent to defraud requires an intent to deceive or cheat for the purpose of either causing a financial loss to another *or bringing about a financial gain to oneself*." (internal citations and quotation omitted) (emphasis added); see also United States v. Frost, 125 F.3d 346, 371 (6th Cir. 1997)).[4]    According to the indictment, "Jones directed

---

[4]Although the defendants in McAuliffe and Frost were charged with mail fraud, "[t]he elements of wire fraud under 18 U.S.C. § 1343 are identical to the elements of mail fraud except that wire fraud's second element requires use of 'an interstate wire communication in furtherance of the scheme.'" United States v. Coffman, 574 F. App'x 541, 549 (6th Cir. 2014) (quoting United

Whitaker and A.J. to submit false statements and representations to the E-Rate Program that the Schools had been billed for the full amount of their required co-payments.  Without these false statements and representations that the Schools had been billed for the full amount of their required co-payments, the E-Rate Program would not have made payments to Jones's companies." (ECF No. 2 at 7 ¶ 27.)    Under <u>McAuliffe</u> and <u>Frost</u>, the indictment sufficiently pleads the intent to deprive element, i.e., Jones intended to deceive the Program into making payments for his personal gain by falsely representing that he billed the Schools for the required co-pay.

Third, courts within this circuit and elsewhere that have addressed challenges to similar wire fraud schemes have found those schemes to fall within the wire fraud statute.  <u>See</u> <u>United States v. Evans Landscaping, Inc.</u>, 1:17-cr-053, 2018 WL 1794336, at *2-3 (S.D. Ohio Apr. 16, 2018); <u>United States v. Lanier</u>, No. 2:14-CR-83(01), 2015 WL 1566115, at *1-4 (E.D. Tenn. Mar. 11, 2015), <u>report and recommendation adopted by</u>, 2015 WL 1566115, at *1 (E.D. Tenn. Apr. 7, 2015); <u>see also</u> <u>United States v. Nagle</u>, No. 1:09-cr-384, 2019 WL 1403393, at *6 (M.D. Penn. Mar. 28, 2019).  In <u>Evans Landscaping</u>, the defendants falsely represented

---

States v. Cunningham, 679 F.3d 355, 370 (6th Cir. 2012)); <u>see also</u> <u>United States v. Leahy</u>, 464 F.3d 773, 786 (7th Cir. 2006) (finding that "[c]ases construing [mail fraud] are equally applicable" to the ones construing wire fraud).

that their organization qualified for Ohio's Encouraging Diversity, Growth, and Equity ("EDGE") program. 2018 WL 1794336, at *1. Based on the defendants' false representations, Ohio certified their organization as a disadvantaged business enterprise ("DBE"), enabling the organization to obtain contracts from Cincinnati through the EDGE program. The defendants were indicted for wire fraud. Subsequently, the defendants moved to dismiss the wire fraud charges, which the court denied. The court rejected the defendants' argument that wire fraud was not adequately pleaded because the contracts were performed, and the City and the other governmental entities received the benefit of their bargain. Id. at *2. The court recognized that while "[t]he Sixth Circuit has yet to address this specific issue[,]" several other "circuits have found that disadvantaged business enterprise fraud claims . . . are proper." Id.; United States v. Leahy, 464 F.3d 773, 788 (7th Cir. 2007) ("In our case[,]" a DBE case, "the scheme precisely and directly targeted Chicago's coffers and its position as a contracting party. . . . Th[e] object [of the scheme] was money, plain and simple, taken under false pretenses from the city in its role as a purchaser of services."); Tulio, 263 F. App'x at 261; United States v. Bunn, 26 F. App'x 139, 142 (4th Cir. 2001) ("Appellants cannot assert that their convictions are improper on the basis that the subcontract work was actually performed to

- 17 -

the satisfaction of the WVDOH, and thus that the WVDOH suffered no financial loss. . . . The gravamen of the offense is not, as Appellants contend, financial loss to the victim; it is, rather, the intent to obtain money or property from the victim of the deceit." (internal citation and quotation omitted)). The Evans Landscaping court ultimately found that the defendants' indictment sufficiently pleaded the offense of wire fraud because the indictment "alleged a scheme to intentionally defraud the City of Cincinnati of money by using false pretenses to obtain contracts." Id. at *3.

In Lanier, the defendant made false representations, using interstate wire communications, to the Small Business Administration and the Department of Veterans Affairs. Id. at *1. Based upon the defendant's false representations, the government awarded the defendant's companies contracts. Id. Further, the indictment alleged that had the defendant not lied to those programs, the government would not have awarded contracts to the defendant's companies. Id. at *2. The defendant was charged with wire fraud and conspiracy to commit wire fraud. When the defendant later moved to dismiss the indictment, the magistrate judge recommended denying the motion and the district judge subsequently adopted the recommendation. Id. at *1-2. In his report and recommendation, the magistrate judge offered the following reasoning:

- 18 -

> Defendant's premise - that the government was deprived
> only of "accurate information" which is not a property
> right is unsound. The inaccurate information caused
> Kylee Construction Company and JMR Investments to be
> awarded lucrative government contracts to which they
> were not entitled. In a real sense, defendant
> facilitated the theft of government money by
> fraudulently appropriating to himself, through Kylee
> Construction and JMR Investments, contract rights that
> rightly should have gone to other (qualified)
> individuals and firms. . . . Nor is it of any
> significance that Kylee Construction Company and JMR
> Investments may have performed their work under the
> government contracts fully and in a workmanlike
> manner. The issue is not the quality of the work
> performed by Kylee Constructions and JMR Investments,
> but rather how Kylee Construction and JMR Investments
> acquired the contracts to do that work.

Id. at *3.

In Tulio, the defendant's company submitted bids for and was subsequently awarded contracts with the Southeastern Pennsylvania Transportation Authority ("SEPTA"). 263 F. App'x at 259. To secure contracts with SEPTA, an applicant had to certify that a certain percentage of work under the contract would be subcontracted to a DBE. While the defendant asserted it complied with this requirement, SEPTA later learned this representation was false. The defendant was convicted of mail fraud. Id. On appeal, the defendant initially attacked the sufficiency of the indictment. The Third Circuit rejected this argument, finding that the indictment "clearly identified the elements of mail fraud and its charging language tracks 18 U.S.C. § 1341." Id. at 261. "In particular, the indictment

- 19 -

charged [the defendant] with obtain[ing] construction contracts
and money from SEPTA by falsely reporting to SEPTA that they
were in compliance with SEPTA's DBE requirement and paying a fee
to a DBE to use its name in the false representations made to
SEPTA." Id. (internal citation and quotation omitted).

The court in Tulio next addressed the defendant's argument
that the government "fail[ed] to prove that SEPTA was deprived
of money or a traditionally recognized property right . . . ."
Id. The court recognized that the "relevant inquiry concerns
what [the defendant] intended - not whether SEPTA was *actually*
deprived of money or property." Id. The court then rejected
the defendant's argument because:

> The Government presented sufficient evidence that the
> object of the fraud was to induce SEPTA to pay [the
> defendant] for work they agreed would be done by a
> DBE, but which was instead performed by [the
> defendant] and his company. For example, the
> Government demonstrated that the defendants were
> instructed multiple times about the requirements of
> the DBE program, that [the defendant] submitted
> reports and altered checks to make it seem that DBE
> Pullins had done the requisite work, and, indeed, that
> [the defendant] never intended to use DBE Pullins to
> perform the requisite work at all. Accordingly, by
> showing [the defendant's] intention to induce SEPTA to
> pay for a service it did not receive - work done by a
> certified DBE - there was sufficient evidence that the
> object of the alleged fraud and conspiracy was SEPTA's
> money, and the District Court's decision not to grant
> a judgment of acquittal will be affirmed.

Id.

In the above-discussed cases, the defendants made false representations with the intent of receiving money from a government program. Similarly, as alleged in the present indictment, Jones made false representations to USAC with the intent of receiving money from the Program for his benefit. The indictment sufficiently pleads the intent to deprive element.

2. <u>Identity of the Victim</u>

Next, Jones argues the wire fraud counts should be dismissed "because the party allegedly being deprived a property right is not the same party purportedly being defrauded." (ECF No. 30-1 at 14.) "A scheme to defraud is 'any plan or course of action by which someone intends to deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises.'" <u>Faulkenberry</u>, 614 F.3d at 580 (quoting <u>United States v. Daniel</u>, 329 F.3d 480, 485 (6th Cir. 2003)). Jones argues there is no criminal liability for fraud "[w]here the alleged victim does not actually possess a property right in the object of the charged scheme[.]" (ECF No. 30-1 at 15.) Jones contends that although the identity of the victim is not readily ascertainable from the face of the indictment, he believes the purported victim is USAC. (ECF No. 30-1 at 16.) Jones argues that "USAC cannot legally be regarded as a victim of the offense because it did not have legal authority to control the funds." (<u>Id.</u>) Alternatively, Jones contends that

- 21 -

even if "the FCC had legal authority and control over the [funds], it is apparent that USAC had no legal title over the funds it administered because the USAC was unlawfully established in the first place[,]" and "without legal title, it could not be a victim in this case[.]" (Id.)

These arguments lack merit at this pre-trial stage. The identity of the alleged victim is not an essential element of the offense of wire fraud. See United States v. Woods, 653 F. App'x 193, 200 (4th Cir. 2016) ("Although 'the victim is important in a case of wire fraud,' the specific identity of the victim is not an element of the offense." (quoting United States v. Strothman, 892 F.2d 1042 (table), 1989 WL 156906, at *5 (4th Cir. 1989))); United States v. Ingram, 62 F. App'x 32, 33 (3d Cir. 2003) ("The identity of the victim or co-perpetrators is not an essential element of [wire fraud]."); United States v. Faulkner, No. 3:09-cr-249, 2011 WL 2880919, at *2 (N.D. Tex. July 15, 2011) ("Furthermore, the identity of the alleged victims is not an essential element of conspiracy to commit wire or mail fraud."). Because the identity of the victim is not an essential element of wire fraud, it necessarily means that any challenge to the victim's "legal status" likewise cannot be a basis to dismiss the indictment.[5]

---

[5]At least one district court has rejected the argument that a wire fraud indictment naming USAC and the FCC as victims is

**C.    Conspiracy to Commit Wire Fraud**

Count 1 of the indictment charges Jones and Whitaker with conspiracy to commit wire fraud.  Under 18 U.S.C. § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  As discussed, wire fraud contains three elements: the defendant 1) "devised or willfully participated in a scheme to defraud"; 2) "used or caused to be used an interstate wire communication in furtherance of the scheme"; and 3) "intended to deprive a victim of money or property."  Faulkenberry, 614 F.3d at 580 (internal citation and quotation omitted).  Conspiracy to commit wire fraud adds two additional elements: (1) "two or more persons conspired, or agreed, to commit" wire fraud; and (2) "the defendant knowingly and voluntarily joined the conspiracy."  United States v. Rogers, 769 F.3d 372, 377 (6th Cir. 2014) (internal citation and quotation omitted).

The court has already found that the indictment sufficiently pleads violations of the wire fraud statute.  Thus, the remaining issue is whether the indictment sufficiently pleads the two additional conspiracy elements.  The indictment

deficient.  See United States v. Green, No. CR 05-208, 2007 WL 9706398, at *1 (N.D. Cal. June 28, 2007).

alleges that "[i]t was part of the scheme and conspiracy to defraud that Jones directed Whitaker and A.J. to submit fabricated documents regarding the Schools to the E-Rate Program to make it appear that all E-Rate rules and requirements had been met." (ECF No. 2 at 7 ¶ 26.) "Jones directed Whitaker and A.J. to submit false statements and representations to the E-Rate Program that the Schools had been billed for the full amount of their required co-payments. Without these false statements and representations . . ., the E-Rate Program would not have made payments to Jones's companies." (Id. at 7 ¶ 27.) Jones subsequently "removed money from the companies' bank accounts for [his] own benefit." (Id. at 7 ¶ 28.) The conspiracy count goes on to allege:

> From in or about 2000 continuing through on or about August 13, 2014, in the Western District of Tennessee and elsewhere, the defendants,
>
> Charles A. "Chuck" Jones
> and
> Mark J. Whitaker
>
> and other known and unknown, including A.J., willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343, to wit, Jones and Whitaker conspired to defraud the E-Rate Program as set forth in the Indictment.

(Id. at 7-8 ¶ 30.) The indictment therefore sufficiently alleges that Jones and Whitaker knowingly conspired and agreed to commit wire fraud.

- 24 -

Defendants do not argue that the conspiracy charge should be dismissed in its entirety. Rather, they argue that the indictment improperly charges them with conspiracy to commit wire fraud for the period from 2000 to 2004. According to defendants, the Program only began requiring the Schools to pay the co-pay in 2004; therefore, prior to 2004, defendants could not have broken any of the Program's rules. (ECF No. 30-1 at 17-18.) As a result, defendants argue that the conspiracy charge for the years 2000 to 2004 should be dismissed.

Defendants' argument is without merit. As an initial matter, defendants are essentially disputing the factual allegations contained on the face of the indictment, which they cannot do pre-trial. See Jones, 542 F.2d at 664. In addition, the government need not establish that defendants violated a separate law or E-Rate regulation to convict them of wire fraud. The Ninth Circuit addressed this exact issue in United States v. Green, 592 F.3d 1057 (9th Cir. 2010). In Green, the defendant was convicted of wire fraud for defrauding the Program. On appeal, the defendant argued "that her actions were not fraudulent because they were not prohibited by the rules and regulations that governed the E-Rate program during the time period charged in the indictment." Id. at 1063. The court rejected this argument, relying on cases concluding that the government does not need to establish a separate violation of

- 25 -

state law to support a wire fraud conviction. Id.; see also United States v. Frost, 321 F.3d 738, 741 (8th Cir. 2003) ("We do not agree that the government, having proved beyond a reasonable doubt each element of the offense [(mail and wire fraud)], must also prove a violation of Arkansas law."); United States v. Emor, 850 F. Supp. 2d 176, 212 (D.D.C. 2012) ("The mere fact that Mr. Emor's diversion of SunRise funds may not have violated any D.C. law or regulation does not mean that his actions were not fraudulent vis-à-vis the District of Columbia and the federal government."). The Green court concluded that "it is settled that wire fraud does not require proof that the defendant's conduct violated a separate law or regulation, be it federal or state law." Green, 592 F.3d at 1064. Here, the indictment need not allege that defendants' conduct violated an E-Rate regulation in order for defendants to be charged with conspiracy to commit wire fraud.

## III. RECOMMENDATION

For the reasons above, it is recommended that defendants' Motion to Dismiss the Indictment be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

August 8, 2019
Date

- 26 -

NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN
FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.
28 U.S.C. § 636(b)(1)(C).   FAILURE TO FILE THEM WITHIN FOURTEEN
(14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND
ANY FURTHER APPEAL.**